## Scranton City, Appellant, v. Scranton Steel Co.

*Navigable rivers—Obstruction—Municipalities—Mandatory injunction.*

A mandatory injunction will not be granted at the suit of a city against a steel company to compel the removal of slag and cinders deposited in a navigable river by the company, where the evidence is conflicting, as to whether the deposit caused a flooding of the public streets, and it seems to the court reasonably certain that the flooding was caused by the erection of piers for a railroad bridge, which have since been removed.

Argued Feb. 23, 1893. Appeal, No. 129, Jan. T., 1893, by plaintiff, from decree of C. P. Lackawanna Co., March T., 1889, No. 3, refusing to grant mandatory injunction. Before STERRETT, C. J., GREEN, WILLIAMS, MITCHELL and DEAN, JJ.

Bill in equity for injunction to restrain encroachment on channel of river and for mandatory injunction to remove matter already deposited. Preliminary injunction as prayed for was issued, but the decree was modified March 11, 1889, by dissolving the mandatory injunction.

The master, J. Alton Davis, Esq., after hearing, recommended a decree as originally prayed for, citing Wheatley v. Christman, 24 Pa. 298; Mason v. Shrewsbury R. R., L. R. 6 Q. B. 578; Trafford, 8 Bing. 204; Attorney Gen. v. Terry, L. R. 9 Ch. Ap. 423; Rex v. Pagham, 8 B. & C. 355; Little Schuylkill Nav. R. R. & Coal Co. v. Richards, 57 Pa. 42; Longstreet v. Hardrader, 17 Ohio St. 23; Pa. Lead Co.'s Ap., 96 Pa. 116; Pottsgrove Boro. v. R. R., 2 Montg. Co. R. 133; Pomeroy's Eq. § 819.

The pleadings and facts are stated in the following opinion of the court below by GUNSTER, J.:

" The principal allegations contained in plaintiff's bill of complaint are that in 1881 the defendant, the Scranton Steel Company, erected large steel works within the limits of the city of Scranton on the east bank of the Lackawanna river, a short distance below its junction with Stafford Meadow brook; that since that time the defendant has deposited cinders, ashes, and other refuse matter from said steel works within the channel of said river, and are continuing to deposit such matters, in

consequence of which the channel has been partially filled, and greatly narrowed, causing the water, even in the case of an ordinary rise in the river, to back up and overflow its banks and flood the streets of the city and greatly damage and injure both public and private property and endanger the safety of the people residing near the said river for a considerable distance above said works; that on several occasions of late, before the filing of the bill, even with an ordinary rise in the flow of water in the river, the material placed in the channel by the defendant has so obstructed the water as to cause it to back up and overflow the public streets and the private property of the citizens and cause great inconvenience to public and private interests; that if such encroachment of the channel of the river is allowed to proceed, the said channel will not be sufficient to carry off the water naturally flowing therein, and in consequence thereof great and irreparable injury will be done to the public and private property of said city; and that the Lackawanna river is a public highway, extending through the centre of the city, with well defined banks and a channel which, previous to the obstruction by the defendant, was amply sufficient to conduct the water naturally flowing in such channel without occasioning damage to the public streets of the city and to the private property of its inhabitants, and endangering their safety. The prayer is for an injunction restraining the defendants from continuing to obstruct the channel of said river by depositing such refuse matter therein and for an order compelling them to remove the matter already deposited in said channel, so as to permit the water to flow to the full width of the natural banks existing at the time the company commenced filling said channel.

" In their answer the defendants, admitting that the legislature had declared the Lackawanna river a public highway for certain purposes, deny the jurisdiction of the city over it. They admit that they have erected large steel works at the place mentioned and that they have straightened the channel of the river in various places; but deny specifically the other allegations of the bill, and particularly that the material deposited by them has filled or narrowed the channel of the river, or caused the water to back up or overflow the banks of the river, or to flood the streets of the city, or to damage pub-

lic or private property, or to endanger the safety of the people residing there; and they allege that when their steel mill was erected there were two channels to carry off the water in front of their property; that the west channel was afterwards entirely closed by embankments and dykes built for that purpose by parties not connected with them, and that by reason thereof one outlet for the water of the river has been cut off, and that abutments and piers have also been built for a bridge across said river by other parties and without their authority or consent, and that the entire backing of the water has been caused by such abutments and the covering up of the western channel of the river.

"I recite the pleadings at such length for the purpose of stating the dispute. I do not think it necessary to enter into an elaborate discussion of the law, for it must be obvious that if what the defendant was or is doing, caused, or threatened to cause, an obstruction to the public streets, or public street within the city, they ought to be restrained, and that if what they have already done causes an obstruction to any public street the nuisance must be abolished.

"The master has found that the defendant has filled in the channel of the river a distance of about one thousand feet in length, and to the width of from forty to fifty feet; that the extent of this filling is shown on a map attached to affidavit of Mr. Blewitt, one of the witnesses; that the filling by the defendant in the channel of the river has impeded the natural flow of the water, and that, at times of ordinary high water, it has caused the water to overflow its banks and discharge the waters upon the public streets of the city and rendered them impassable; that the acts of other parties, not parties to this proceeding, in also encroaching upon the river, has increased the mischief and caused more frequent overflows, and he recommends not only a perpetuation of the preliminary injunction heretofore granted, but also a mandatory injunction requiring the defendant to remove from the channel of the river the slag and refuse deposited therein by them.

"The exceptions to the master's report are argumentative, and not very specific. It is sufficiently clear, however, that they are aimed at the right of the city to maintain the bill of complaint, and at the sufficiency of the evidence to sustain the master's findings of fact and his recommendations.

" Some confusion is caused by the charge in the bill that the encroachments on the river by the defendant had caused injury and damage to private property. There is considerable evidence to sustain this charge, and it only tends to add to the confusion. If there were no other charge the city would have no standing, for it is only when the rights of the public, in which the city as a municipality has an interest, are affected, that the city has a right to complain. But, while the bill charges injury to private property, it also fairly charges that the material deposited in the river by the defendant has caused the water to back up and overflow public streets over which the city has control, and for the inconvenience of which it is responsible. Counsel for defendant does not deny that in such a case the city would have a standing. His contention is that the proof that the streets which were flooded were public streets is entirely insufficient and inadequate. This question does not appear to have been squarely raised by the pleadings. As I understand the answer of the defendants they do not deny that the streets, which are alleged to have been flooded, were public streets, but that the material which they had deposited in the river had caused, or·threatened to cause, the flooding. But aside from this we think the evidence sufficient to warrant the finding of the master in this respect. Mr. Gilbert in his testimony says : ' These overflows have interrupted travel on public streets; last time the water was about six inches in front of my fences on Washington street. At another time four and a half feet of water on premises and Washington avenue flooded up to Elm street. It also overflowed lower end of Elm street and part of Water street.' These streets are public traveled streets. City Engineer Blewitt, in speaking of the locality flooded, says : ' The streets are opened to travel. Washington avenue is one of the principal throughfares of the city.' Other witnesses testified that travel was interrupted by the flooding, that public travel on the streets was stopped ; Washington avenue is flooded on the Blewitt map, and is also noted on the map offered in evidence on part of the defendant. The master who was also the examiner, and had the witnesses before him, understood them, when they spoke of a street or avenue, to mean a public street or avenue, and we so understand them. The objection that there is no evidence of a formal

acceptance of these streets by the city is somewhat technical. We think in a case of this kind when the streets are opened and traveled by the public, and the city claims control over them, and the defendant does not allege or attempt to prove any right to obstruct them, such formal proof is not necessary. We may add, what is not in evidence, but within our own knowledge, that Washington avenue is the western boundary of our court house square, though happily not at the point where it was flooded.

" So far as the river itself is concerned the city has shown no right to control it; while the bill alleges that it is a public highway, the answer sets forth that it was declared a public highway by the legislature for certain·purposes.   It seems that by the act of 26th March, 1813, 6 Sm. L. 65, it was declared to be a public highway from its mouth to Ragged island, at the mouth of Rush creek, ' for the passing of rafts, boats, or other vessels,' while the city is authorized by the act of 1874, P. L. 230, section 20, clause 20, and by the act of 1889, P. L. 277, article v, section 3, clause XXXIII, ' to establish, alter and change the channels of water courses, and to wall them and cover them over, to establish, make and regulate public walls, cisterns, aqueducts, and reservoirs of water, and to provide for filling the same,' there is no evidence in the case that the city has ever exercised this authority or acquired any rights thereunder.   The master correctly concluded that if relief is to be given to the city, it should be given, not because of any control she might, but has not, exercised over the stream, but for the invasion of her right to use the public streets of the city for the purposes of public travel.

" While the evidence shows repeated overflows and injury to private property, it discloses only two floodings of the streets which can be properly attributed to obstructions placed in the river.   This appears from the testimony of Mr. Gilbert.   They occurred March 22, 1888, and December 17, 1888.   Plaintiff's bill was filed March 2, 1889.   The master made his report November 30, 1891, and exceptions to this report were argued before last February.   Before the arguments of the exceptions it was admitted that the streets in this locality mentioned had not been flooded since December 17, 1888.   This fact threw a serious doubt upon the correctness of the master's findings of

fact and upon the wisdom of his recommendation, and we have examined the evidence to ascertain whether they could be sustained.

"It is an undisputed fact that the 'Flats' as the locality is popularly called, upon which the defendants have erected their steel works, consist of low lands, which are liable to inundation in times of extraordinary high water.   In the construction and operation of their works the defendants filled up much of their own land under an arrangement with all but two of the owners of low lands abutting on the east side of the river, above them; they were raising the east bank of the river by depositing slag and cinders thereon when they were restrained by the preliminary injunction.   There is evidence that in these filling operations the defendants encroached upon the bed of the stream, but the evidence of the extent of their encroachments is very unsatisfactory.   Mr. Scranton, the principal witness for the defendants, testified that they did not deposit any material in the channel of the river where it was then; that the channel had changed, and that they had only put slag and other material along the east bank and filled up some of the bays and gulfs, so as to make a straight corner for the wire.   Upon part of the plaintiff, Mr. Schantz testified that defendants have filled the channel from 40 to 50 feet; Mr. Schwenk testified to from 45 to 55 feet; Mr. Nothacker to from 80 to 120 feet, and Mr. Gilbert testified that the defendants have filled the channel of the river from the east bank from 60 to 120 feet.   The master finds that the east bank of the river has been filled by the defendants a distance of about 1000 feet in length and to the width of from 40 to 50 feet; that the extent of this filling is shown on the map attached to the affidavit of Mr. Blewitt, which map he finds to be correct and adopts as showing the encroachments by the defendants on the former bed of the river.   In all the testimony there is no reference to any landmark.   None is noted on the Blewitt map.   The map itself does not purport to have been drawn on any particular scale, and there is no evidence to show upon what scale it is drawn.

"But whatever may be the extent of these encroachments there are other facts and circumstances to be considered in order to reach a just conclusion.   It appears from the undisputed testimony in the case that formerly the Lackawanna

river, at a point a little above the premises of the defendant, divided into two channels.    One of these flowed about where the river is now, and the other flowed a little west and rejoined the first some distance below.    Immediately above this division, on the west side of the river, was a culm dump of one of the collieries of the Delaware, Lackawanna and Western Railroad Company.    Some time after the defendants had erected their plant, when, the evidence has not shown, the Wilkes-Barre and Scranton Railroad Company constructed their railroad on the west side of the river, and at this immediate point, between the rail and west channel of the river.    When the railroad was completed the west channel was closed at both ends.    Mr. Marple testifies that when he made his survey it looked as if a timber dike had been put there to stop the water from running through.    It does not appear from the evidence, either by what authority or by whom the western channel of the river was obstructed, but the natural consequence of the obstruction was to turn all the water of the river into the eastern channel. While the evidence shows that these encroachments on each side of the river straightened the course of the stream, and increased the full and rapid descent of the water, it also shows that they caused the water to set back, and repeatedly, in times of ordinary rain, to cause more or less injury to private property.    But there is no satisfactory evidence that they caused any obstruction to the public street.

"After the completion of the railroad on the west side, but when, the evidence does not show, the Central Railroad of New Jersey, into whose control the former road had passed, erected in the channel of the stream, above the steel works, abutments and piers for a bridge over the river.    This impeded the flow of the river still more, and in March and December, 1888, as said before, portions of Washington avenue and some other public streets were submerged, and public travel there was for a time interrupted.    After the flood of December, 1888, the railroad company took down one half of the piers of the bridge, and since the removal of these piers the streets have not been affected by the water of the river.

"There is much diversity of opinion among the witnesses as to what caused the river to rise high enough to flood the streets. Some of those called on behalf of the city attributed it entirely

to the filling done by the defendants. They do not mention the closing of the west channel or the construction of the bridge. Other witnesses attribute it to the closing of the west channel, while others are of opinion that it was caused by the erection of the abutments and piers of the bridge in the channel of the river, and this last seems to me to be the most reasonable view of the matter. There was no evidence as to what is the width or capacity of the natural bed of the stream, but we are satisfied that it was encroached upon from both sides until it was very materially narrowed. When the piers of the bridge were erected in this narrowed channel, they naturally dammed the stream and threw the water back. What seems to us as conclusive of this is that before the erection of these piers the streets were never flooded except at times of extraordinary high water, and that since they have been removed the streets have not been flooded at all.

"It remains to be considered whether the injunction heretofore granted should be made perpetual, and whether the defendants should be compelled to remove the materials they have already deposited in the channel of the river. In the light of the facts already stated, and which are virtually uncontradicted, it seems to us that it would be highly imprudent to permit any further encroachments upon the river. As said before, there is no evidence as to what was the width or capacity of the material channel of the stream, but it appears from the testimony of Mr. Marple that when he made his survey the narrowest part of the river bed, as it then existed, was only forty-three feet wide. City Engineer Blewitt testifies that if the filling is continued Washington avenue below Roaring brook, and the streets which cross it, will not be safe. Mr. Ambrust testifies that, from the nature of the water basin of the river above the city, the river is subject to heavy floods in time of rain and melting snow. There is evidence of some six or eight floods during the past thirty years. It is true these were extraordinary, but they show that the locality is much more subject to inundations than other places. And the fact, already pointed out, that the erection of two bridge piers caused the water to flow back upon the streets, shows that the stream will not tolerate any further substantial obstruction.

"We fail to see upon what ground the master bases his rec-

ommendation for a mandatory order. Certainly the facts found by him do not warrant it. He remarks that no right is shown in the defendant to take the channel of the river for its private use. To the extent that no right is shown to do so to the injury of others, this is true, but no further. It must be borne in mind, except for the allegation that the river is a public highway, the defendant's title is not questioned by the bill. The defendants assert title in their answer, are in possession and show possession under a purchase. As already shown the city has no right to the river, and it is only as her interests in the public streets are affected that she has any standing. While the master finds that the filling and changes in the channel of the river have, in times past, caused the river to overflow the streets, he does not find that they caused, or threatened to cause it at the time of the filing of the bill, or that they caused, or threatened to cause it at any time since, or that they are doing so now. And we do not see how, from the evidence before him, the master could well so find. The evidence that the filling done by the defendant is likely to result in injury to or interference with the streets is very slight and unsatisfactory, and while it may have resulted in injury to some private property the fair preponderance of the testimony is that, instead of tending to throw the water of the river upon the streets, it tends to keep it off. It is causing no injury to the streets now, and does not threaten to cause any in the future, and we see no good reason for compelling the defendants to go to the expense of dredging it out. The exception to the sufficiency of the evidence to restrain a mandatory injunction is sustained. The others are dismissed.

" The prayer for an order compelling the defendants to remove the matter already deposited in the channel of the river is refused, the injunction heretofore granted as modified is made perpetual, and it is ordered that the defendants pay the costs."

*Errors assigned* were, (1) refusal to grant the mandatory injunction, (2) in holding that the evidence was insufficient to justify the decree.

*I. H. Burns*, city solicitor, for appellant, cited, Audenried v. P. & R. R. R., 68 Pa. 370, as to right to mandatory injunction.

*Alfred Hand* and *Wm. J. Hand,* for appellee, not heard, cited, Zug v. Com., 70 Pa. 138 ; Stover v. Jack, 60 Pa. 344 ; Ritchie v. R. R., 31 Pitts. L. J. 424 ; Angell, Water Courses, p. 122, § 108 ; Gould, Waters, §§ 160, 190 ; Trafford v. King, 8 Bing. 204 ; Shelbyville Twp. v. Green, 99 Ind. 205 ; Grodall v. Tuttle, 29 N. Y. 459 ; Turner v. Inhabitants, 13 Allen, 291 ; Dillon, Mun. Corp. 505, note ; High, Injunctions, § 2 ; Dillon, § 802.

PER CURIAM, March 6, 1893 :

In his report, the learned master recommended a decree making perpetual the preliminary injunction theretofore granted and modified by order of March 11, 1889, and directing the issuance of a mandatory order requiring the defendant to remove, from the channel of the river, the slag and refuse deposited therein, etc.    On hearing the exceptions to said report, the learned judge came to the conclusion that the facts of the case, to which reference is made in his opinion, did not justify the mandatory order, and he accordingly entered a decree making perpetual the modified injunction theretofore granted and ordering the defendants to pay the costs.

The errors assigned are, (*a*) refusal to grant the mandatory order prayed for, and (*b*) holding that the evidence was insufficient to justify said order.

An examination of the testimony has satisfied us that, for the reasons clearly stated in his opinion, the learned judge was correct in his conclusions, and we accordingly adopt his opinion and affirm the decree thereon.

Decree affirmed and appeal dismissed, with costs to be paid by the appellant.