**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 19-1643**

───────────

SALLIE M. ZEIGLER, as Personal Representative of the Estate of Alton Ray Zeigler,

Plaintiff - Appellant,

v.

EASTMAN CHEMICAL COMPANY; MUNDY MAINTENANCE SERVICE AND OPERATIONS LLC,

Defendants - Appellees.

───────────

**No. 19-1646**

───────────

JACOB S. JACKSON,

Plaintiff - Appellant,

v.

EASTMAN CHEMICAL COMPANY; MUNDY MAINTENANCE SERVICE AND OPERATIONS LLC,

Defendants - Appellees.

───────────

**No. 19-1647**

───────────

KEVIN R. VANN; KELLI D. VANN,

Plaintiffs - Appellants,

v.

EASTMAN CHEMICAL COMPANY; MUNDY MAINTENANCE SERVICE AND OPERATIONS LLC,

Defendants - Appellees.

_____

Appeals from the United States District Court for the District of South Carolina, at Orangeburg.  J. Michelle Childs, District Judge.  (5:17-cv-01010-JMC; 5:17-cv-01015-JMC; 5:17-cv-01013-JMC)

_____

Argued:  September 14, 2022                       Decided:  November 23, 2022

_____

Before WYNN and HARRIS, Circuit Judges, and KEENAN, Senior Circuit Judge.

_____

Reversed and remanded by published opinion.  Judge Harris wrote the opinion, in which Judge Wynn and Senior Judge Keenan joined.

_____

**ARGUED:**  Louis M. Bograd, MOTLEY RICE LLC, Washington, D.C., for Appellant. Allen Mattison Bogan, NELSON MULLINS RILEY & SCARBOROUGH LLP, Columbia, South Carolina; Keith D. Munson, RIMON LAW, Greenville, South Carolina, for Appellees.  **ON BRIEF:**  Heath P. Taylor, TAYLOR LAW FIRM LLC, West Columbia, South Carolina, for Appellant Jacob S. Jackson. Charles T. Slaughter, WALKER MORGAN, LLC, Lexington, South Carolina, for Appellants Kevin R. Vann and Kelli D. Vann.  George C. Johnson, JOHNSON, TOAL & BATTISTE, P.A., Columbia, South Carolina, for Appellant Sallie M. Zeigler.  T. David Hoyle, John David O'Neill, Marlon E. Kimpson, MOTLEY RICE, LLC, Mount Pleasant, South Carolina, for Appellants.  John F. Kuppens, Blake T. Williams, Columbia, South Carolina, Samuel O. Outten, NELSON MULLINS RILEY & SCARBOROUGH LLP, Greenville, South Carolina, for Appellee Eastman Chemical Company.  Catherine F. Wrenn, WOMBLE BOND DICKINSON (US) LLP,  Greenville, South Carolina, for Appellee Mundy Maintenance Service and Operations, LLC.

_____

PAMELA HARRIS, Circuit Judge:

These consolidated tort actions arise out of a 2016 industrial accident at a South Carolina chemical-manufacturing plant. Three independent contractors of Eastman Chemical Company were severely injured, one of them fatally, when a pump exploded during maintenance. Eastman moved to dismiss their state-law personal injury suits, contending that the contractors qualified as Eastman's "statutory employees" under the South Carolina Workers' Compensation Law – which would mean that workers' compensation was their exclusive remedy and that the courts lacked jurisdiction to hear their claims. *See* S.C. Code §§ 42-1-10 *et seq*.

The district court agreed that the plaintiffs were Eastman's "statutory employees" under the workers' compensation law and dismissed their actions. On appeal, we held their cases in abeyance pending the decision of South Carolina's Supreme Court in *Keene v. CNA Holdings, LLC*, 870 S.E.2d 156 (2021).

That court has now clarified, in *Keene*, that when an employer makes a "legitimate business decision" to outsource a portion of its work, the contractors it hires to perform that work are not "statutory employees" for workers' compensation purposes. 870 S.E.2d at 163. No party here contests that Eastman's outsourcing of its maintenance and repair work was a "legitimate business decision." It follows that the plaintiffs, independent contractors performing maintenance at the time of the 2016 pump explosion, were not statutory employees and may bring personal injury actions. Accordingly, we reverse the district court's judgment dismissing the actions for lack of subject matter jurisdiction and remand for further proceedings.

3

## I.

## A.

We begin with a brief description of the governing statutory framework. This appeal turns on one question: whether the South Carolina Workers' Compensation Law ("the Act"), S.C. Code §§ 42-1-10 *et seq.*, which provides the exclusive remedy for covered employment-related injuries, bars the plaintiffs' tort actions. The Act creates a "quid pro quo arrangement," in which an "employee receives the right to swift and sure compensation in exchange for giving up the right to sue in tort." *Harrell v. Pineland Plantation, Ltd.*, 523 S.E.2d 766, 772 (1999) (internal quotation marks omitted). Consistent with that trade-off, the Act's exclusivity provision states that the workers' compensation "rights and remedies granted by this title to an employee . . . *shall exclude all other rights and remedies of such employee* . . . against his employer, at common law or otherwise[.]" S.C. Code § 42-1-540 (emphasis added). This immunity extends both to the employer and to any co-employees "conducting [the employer's] business." S.C. Code § 42-5-10. Eastman contends that the plaintiffs' injuries are covered by workers' compensation, and that the Act's exclusive remedy thus deprives us of subject matter jurisdiction to hear their personal injury actions.

The plaintiffs, on the other hand, point to an express exemption in the Act for "injuries resulting from acts of a subcontractor of the employer," which preserves a tort remedy for workers – like themselves – who are independent contractors of a business owner. S.C. Code § 42-1-540. But the Act clarifies that not *all* independent contractors are exempt from its coverage. The so-called "statutory employee provision" – at the heart

4

of this case – makes independent contractors the equivalent of employees in certain circumstances: When an employer "undertakes to perform or execute any work *which is a part of his trade, business or occupation* and contracts" with an independent contractor to complete that work, the terms of the Act apply as if "the work[er] had been immediately employed by him." *Id.* § 42-1-400 (emphasis added). Eastman claims that the plaintiffs, though admittedly independent contractors, were injured while performing maintenance work that was "part of [Eastman's] trade, business or occupation." As a result, Eastman contends, we must treat the plaintiffs *as if* they were Eastman's direct employees and conclude that the Act bars their personal injury actions.

After jurisdictional discovery, the district court concluded that the plaintiffs' maintenance and repair work was indeed part of Eastman's "trade, business or occupation" and that it therefore lacked subject matter jurisdiction to hear their tort claims. The questions before us, then, are how South Carolina courts interpret the scope of an owner's "trade, business or occupation" under the statutory employee provision and whether the plaintiffs' labor qualifies under that definition.

## B.

### 1.

On December 6, 2016, Alton Zeigler, Jacob Jackson, and Kevin Vann – three maintenance employees of DAK Americas LLC – attempted to remove a faulty pump on a chemical production line owned by Eastman Chemical Company. During this process, the pump exploded, injuring or killing the DAK employees and giving rise to this action.

5

To understand the business relationship between Eastman and DAK, the plaintiffs' employer, we first rewind several decades. In 1967, Eastman Chemical Company opened the chemical-manufacturing facility at issue in this case, in Calhoun County, South Carolina. It continuously operated the plant until 2011, when it sold the facility to DAK Americas LLC, a subsidiary of a Mexican chemical company. In the sale, Eastman retained several assets at the facility, including four of the plant's 13 chemical production lines.

At the same time, Eastman terminated virtually its entire 400-person workforce at the facility. Former Eastman workers were required to reapply for employment with DAK, and nearly all 400 Eastman employees became DAK employees. Eastman then contracted with DAK to operate and maintain its retained lines – to provide, in essence, the same labor previously done by its own employees. Eastman preserved only a small managerial force (three employees, at the time of the 2016 accident) to coordinate with DAK's on-site labor. DAK, in turn, contracted with Mundy Maintenance Service and Operations LLC, also a defendant in this action, for supplemental maintenance and other services at the Calhoun County plant.

These contractual relationships set the backdrop for the accident at issue here. In December 2016, production halted on Eastman's retained lines for an annual maintenance shutdown. This maintenance included removal of a pump that helped feed superheated liquid monomer through the production line. DAK employees planned to drain the superheated chemicals from the line before removing the pump. The line's drain was not working, however, possibly because a cooled chemical was plugging the drainpipe. On

6

December 3, Mundy employees attempted to use a torch to heat the drainpipe, in hopes of melting any chemicals clogging the drain.  This attempt was apparently unsuccessful.

As a result, on December 6, DAK used an alternative procedure to remove the pump "hot" – that is, without first draining the monomer.  But soon after Zeigler, Jackson, and Vann loosened the bolts securing the pump, an explosion erupted, spewing chemicals across the room.  The molten liquid – which was heated to approximately 300 degrees Celsius – killed Zeigler and severely burned Jackson and Vann.

**2.**

In April 2017, the plaintiffs – Zeigler's surviving spouse, Jackson, and Vann and his spouse – commenced separate personal injury actions against Eastman and Mundy in federal district court, invoking diversity jurisdiction under 28 U.S.C. § 1332.  The plaintiffs alleged, in sum, that Eastman's employees were negligent in their management of the retained line, and that Mundy's employees were negligent in their attempt to unclog the drainpipe prior to the explosion.

Eastman's answers asserted "that all claims against it must be dismissed pursuant to Rule 12(b)(1)" on the basis that the plaintiffs were Eastman's statutory employees and thus subject to the South Carolina Workers' Compensation Commission's exclusive jurisdiction. J.A. 74.  At an initial scheduling conference, the district court ordered limited discovery and briefing on the statutory employment doctrine and its effect on the court's subject matter jurisdiction.

At the close of jurisdictional discovery, Eastman and Mundy each moved to dismiss the actions under Federal Rule of Civil Procedure 12(b)(1).  Though formally independent

7

contractors, they argued, the plaintiffs qualified as "statutory employees" of Eastman under South Carolina's Workers' Compensation Law, making workers' compensation their exclusive remedy. Eastman cited South Carolina's traditional three-part test for determining when an activity, though performed by a contractor, is "part of [an owner's] trade, business or occupation," S.C. Code § 42-1-400, and thus creates a statutory employment relationship: "(1) [T]he activity of the subcontractor is an important part of the owner's trade or business; (2) the activity performed by the subcontractor is a necessary, essential, and integral part of the owner's business; or (3) the identical activity performed by the subcontractor has been performed by employees of the owner." J.A. 299–300 (quoting *Collins v. Charlotte*, 772 S.E.2d 510, 514 (2015)). "If any of these tests is satisfied," courts often stated, "the injured worker is considered the statutory employee of the owner." *Collins*, 772 S.E.2d at 514 (internal quotation marks omitted).

Eastman contended that the plaintiffs' labor qualified under all three tests. It relied primarily on a longstanding line of cases deeming repair and maintenance work "important" and "integral" to business operations, making contractors who perform that "essential" work the owner's statutory employees in most instances. *See Singleton v. J.P. Stevens & Co.*, 533 F. Supp. 887, 888 (D.S.C. 1982), *aff'd*, 726 F.2d 1011 (4th Cir. 1984). It also noted, with respect to the third test, that Eastman had performed "the exact type of work" with its own employees prior to its sale of the facility to DAK in 2016. J.A. 310.

The plaintiffs did not dispute the general three-part test laid out by the defendants. But they cited a more recent line of South Carolina Supreme Court precedent that appeared to put that traditional approach in some doubt. According to those cases, the "mere fact"

8

that an activity is "essential for the conduct of the business does *not* mean" that the activity is part of the owner's "trade, business or occupation" for purposes of the statutory employee provision. J.A. 498 (quoting *Abbott v. The Ltd., Inc.*, 526 S.E.2d 513, 514 (2000) (emphasis added)). If the contracted activity "is not the primary business" of the owner, the Court reasoned in *Olmstead v. Shakespeare*, 581 S.E.2d 483, 485 (2003), then those conducting it do not become the owner's statutory employees. Moreover, the Court in *Olmstead* purported to "overrule all prior cases to the extent they are in conflict" with its holding, though it did not identify which cases that would be. *Id.* at 427.

Against this unsettled backdrop, the district court ruled in Eastman's favor and dismissed the plaintiffs' actions. Citing the older line of caselaw describing maintenance work as "necessary to" a business's operation, the court held that the plaintiffs qualified as statutory employees under the first of the three traditional tests: Maintenance on the production lines retained by Eastman is an "important part of Eastman's trade, business, or occupation." J.A. 160; *see Collins*, 772 S.E.2d at 514.

Mundy's immunity necessarily followed from this holding. Because Mundy's employees conducted this same "essential" maintenance work alongside the plaintiffs, and because the Act extends its "employer immunity to statutory co-employees conducting a statutory employer's business," the court ultimately concluded that Eastman's statutory immunity exempted Mundy from suit, as well. J.A. 180–81 (citing S.C. Code § 42-5-10); J.A. 279–80.

Mundy's motion to dismiss also raised a merits defense under South Carolina common law, asserting that its employees were Eastman's "borrowed servants" and that

9

any liability for their conduct thus flowed to Eastman, not Mundy. J.A. 1825–26. The district court considered this alternative ground for dismissal but concluded that "based on the current evidence of record," Mundy could not "satisfy all of the elements of the borrowed servant doctrine to exempt itself from liability." J.A. 282.

**3.**

In February 2019 – three months after the district court dismissed the plaintiffs' actions – the South Carolina Court of Appeals decided *Keene v. CNA Holdings, LLC*, 827 S.E.2d 183 (Ct. App. 2019). Applying *Olmstead*, the Court of Appeals concluded that maintenance contractors are *not*, as a general matter, manufacturers' statutory employees. *Id.* at 190 (citing *Olmstead*, 581 S.E.2d at 486; *Abbott*, 526 S.E.2d at 514). Because the *Keene* employer had "presented no evidence that its corporate purposes included equipment maintenance," the Court of Appeals held, the contractors it hired to conduct that maintenance were not its statutory employees. *Id.* at 193 (internal quotation marks omitted).

The plaintiffs moved for reconsideration in light of *Keene*. The district court recognized that it was now "constrained . . . to conclude that in South Carolina, maintenance and repair work of equipment by the employees of an independent contractor, without something more, generally does not qualify" as statutory employment. J.A. 269. Nonetheless, *Keene* did not change the court's conclusion that "maintenance on a line that produces chemicals that Eastman sells is an important part of Eastman's trade, business, or occupation." J.A. 270. The court found it dispositive that "nearly all of DAK's 400 employees at the manufacturing facility were formerly Eastman's employees," and that,

10

had the sale never occurred, each plaintiff "would have been performing this same task as an Eastman employee on the day the incident occurred." *Id.* Because DAK's maintenance work was "just as important to Eastman's business" in 2016 as it was before the 2011 sale, the court denied the plaintiffs' motions. J.A. 270–71.[1]

On June 17, 2019, the plaintiffs filed timely notices of appeal. We consolidated the appeals, *see* Fed. R. App. P. 3(b)(2), and then put the case in abeyance pending the South Carolina Supreme Court's review of the Court of Appeals' decision in *Keene*. The Supreme Court decided *Keene* on August 11, 2021. *See Keene v. CNA Holdings, LLC*, 870 S.E.2d 156 (2021), *reh'g denied* (Apr. 5, 2022).

In affirming the Court of Appeals, the Supreme Court moved away from the formalism of the three-part test to "refocus" the inquiry "on the key question posed by the statute": whether "the work contracted out is 'part of [the owner's] trade, business or occupation.'" *Id.* at 162–63 (quoting S.C. Code § 42-1-400). The Supreme Court emphasized that this "is a question of business judgment, not law": When a company makes the "legitimate business decision to outsource" a portion of its labor force, the contractors it then hires are no longer part of its "trade, business or occupation." *Id.* at 163. Because there was "no question" the *Keene* manufacturer made a legitimate business

---

[1] The district court also cited an "Operating Agreement" between Eastman and DAK that "expressly contracted [for] DAK's employees to be considered statutory employees of Eastman." J.A. 270 n.4. But it is undisputed that the Operating Agreement covered only Eastman's *operation* of the retained lines, and that the plaintiffs were covered exclusively by a different Services Agreement – for maintenance, repair, and other ancillary services – that includes no similar statutory employment provision. On appeal, no party asks us to adopt this part of the district court's reasoning.

decision to outsource its maintenance and repair work, the contractors it hired were not its statutory employees. *Id.*

The South Carolina Supreme Court denied rehearing on April 5, 2022. We are now tasked with applying *Keene* to the plaintiffs' claims in the first instance.

## II.

We review de novo a district court's dismissal for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). *Balfour Beatty Infrastructure, Inc. v. Mayor & City Council of Baltimore*, 855 F.3d 247, 251 (4th Cir. 2017). A Rule 12(b)(1) motion to dismiss should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999) (internal quotation marks omitted).

Because federal jurisdiction here rests on the parties' diversity of citizenship, we apply South Carolina law. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). In determining state law, we start with the decisions of the South Carolina Supreme Court, giving "appropriate effect to all [their] implications." *Stahle v. CTS Corp.*, 817 F.3d 96, 100 (4th Cir. 2016). To the extent the state's highest court has not "directly addressed" an issue, we "anticipate" what its decision would be. *Id.* So our task here is to determine whether the Supreme Court of South Carolina would conclude that the plaintiffs were Eastman's statutory employees at the time of the 2016 accident.

12

## A.

### 1.

Fortunately, we need not do much anticipating, as *Keene*'s "refocused" inquiry squarely resolves the case before us. To understand *Keene*'s import, we begin with the history of the South Carolina Workers' Compensation Law. Prior to the enactment of the original Workmen's Compensation Act of 1936, Act No. 610, 1936 S.C. Acts 1231, "an employee who sustained a work related injury had no choice but to look to the courts for compensation." *Parker v. Williams & Madjanik, Inc.*, 267 S.E.2d 524, 526 (1980). This remedy was "usually unsatisfactory," as employers could assert several affirmative defenses to common-law liability, and "employees generally received little or no compensation because at least one defense was usually applicable." *Id.*

Over time, "society recognized the need for a comprehensive approach to provide adequate compensation for injured employees." *Id.* Workers' compensation law – in South Carolina and across the country – developed in "recognition of the advisability, from the standpoint of society as well as of employer and employee, of discarding the common law idea of tort liability" in favor of routinized, no-fault compensation for workers injured on the job. *Case v. Hermitage Cotton Mills*, 115 S.E.2d 57, 66 (1960). This "recognition" led to the Act's "quid pro quo": "The employee receives the right to swift and sure compensation in exchange for giving up the right to sue in tort; the employer receives such tort immunity in exchange for complying with those provisions of the Act" – namely, the procurement of adequate insurance – "that insure swift and sure compensation for the employee." *Harrell*, 523 S.E.2d at 772 (internal quotation marks omitted).

13

This context also explains the purpose of the Act's so-called "statutory employee" provision. Because the Act exempts independent contractors from its coverage, the South Carolina legislature feared that employers "might be tempted to subdivide their regular operations among subcontractors, thus escaping direct employment relations with the workers" and avoiding the Act's duty to secure adequate workers' compensation insurance. *Keene*, 870 S.E.2d at 158 (quoting Lex K. Larson et al., Larson's Workers' Compensation Law § 70.05 (2020)). Accordingly, the statutory employee provision clarifies that when an employer uses an independent contractor "to perform or execute any work which is part of his trade, business or occupation," the Act applies as if "the work[er] had been immediately employed by him." S.C. Code § 42-1-400.

But what constitutes "part of" an employer's "trade, business or occupation" is a question that has vexed South Carolina courts from the beginning. *See Keene*, 870 S.E.2d at 157 ("For eighty-two years, this Court struggled to correctly apply . . . the 'statutory employee doctrine.'"). As the *Keene* Court noted, the "resulting body of jurisprudence is confusing, often conflicting, and always difficult for the workers' compensation commission and the circuit court to apply." *Id.*

In *Keene*, the Court set out to synthesize and clarify this muddled doctrine. In the "early years" after the Act's passage, the Court recognized, "this Court viewed the scope of an employer's 'trade, business or occupation' quite broadly." *Id.* at 158. This broad interpretation – relied upon by Eastman and the district court here – appeared "to include any work we deemed necessary to the owner's business." *Id.* at 159; *see Marchbanks v. Duke Power Co.*, 2 S.E.2d 825, 837 (1939) (holding that a contractor who painted a power

14

company's metal power poles every two years was a statutory employee because "it was necessary that the poles be protected from the weather" (cleaned up)); *Boseman v. Pacific Mills*, 8 S.E.2d 878, 880 (1940) (same, for painting a water tower); *Bell v. South Carolina Electric & Gas Co.*, 109 S.E.2d 441, 442 (1959) (same, for "repair and maintenance . . . of poles and wire").

On this reading of the Act, contractors performing essential maintenance work on a manufacturing line surely qualify as statutory employees. But "[t]he reality," the Court continued, "is that none of our recent jurisprudence on this question is consistent with the broad interpretation of 'trade, business or occupation' in our original cases." *Keene*, 870 S.E.2d at 160. In these more recent decisions – on which the plaintiffs here relied – the Court, rather than evaluating the "necessity" of the contractor's labor to the employer's operation, instead prioritized employers' "legitimate choices about the scope of their company's business." *Id.* (citing *Bridges v. Wyandotte Worsted Co.*, 132 S.E.2d 18 (1963); *Wilson v. Daniel Int'l Corp.*, 197 S.E.2d 686 (1973); *Glass v. Dow Chem. Co.*, 482 S.E.2d 49 (1997); *Abbott*, 526 S.E.2d 513; *Olmstead*, 581 S.E.2d 483).

This more recent focus on the "business decisions of management," *Keene* concluded, best comports with the text and purpose of the Act. 870 S.E.2d at 162. As the Court noted, the "original purpose of the statutory employee doctrine was to prevent business managers from outsourcing work for the purpose of avoiding workers' compensation costs. That purpose has nothing to do with outsourcing work for legitimate business reasons." *Id.* at 163. Consistent with that understanding, the Supreme Court laid out its holding in *Keene* as follows:

15

> If a business manager reasonably believes her workforce is not equipped to handle a certain job, or the financial or other business interests of her company are served by outsourcing the work, and if the decision to do so is not driven by a desire to avoid the cost of insuring workers, then the business manager has legitimately defined the scope of her company's business to not include that particular work.

*Id.* Courts, in other words, must "focus initially *on what the owner decided* is part of its business." *Id.* (emphasis added). At core, "what is or is not 'part of' the owner's business is a question of business judgment, not law." *Id.*

As for the three traditional tests, the Court noted only that "[w]hile each test remains a valid consideration, today we refocus" on the core inquiry: how the employer has "legitimately defined the scope of her company's business." *Id.* Because in *Keene* there was "no question [the employer] made a legitimate business decision to outsource its maintenance and repair work," those maintenance workers were not its statutory employees. *Id.* The *Keene* Court did not think it necessary to consider the three-part test in reaching this conclusion.

We have little trouble reaching the same conclusion here. When Eastman sold the Calhoun County plant in 2011 and laid off nearly all 400 of its workers, it made a "legitimate business decision to outsource" its operations and maintenance work to DAK. As in *Keene*, Eastman's "business managers considered the economic interests of the company and determined maintenance and repair was not 'work which is a part of [its]

16

trade, business or occupation.'" *Id.* The 2011 Services Agreement between the parties is unequivocal: DAK was to be "at all times an independent contractor." J.A. 405.[2]

Eastman does not claim that it still employs production, maintenance, or repair workers at the plant. And it has *never* claimed that its outsourcing operation was somehow illegitimate or "driven by a desire to avoid the cost of insuring workers." *See Keene*, 870 S.E.2d at 163. Eastman conceded at oral argument that it does not allege illegitimate motivations, and there is nothing in the record that could support such a finding. Indeed, it is uncontested that the plaintiffs here were insured by – and received worker's compensation from – their direct employer, DAK. Under a straightforward application of *Keene*, these undisputed facts are sufficient to resolve the case.

Eastman's limited attempts to distinguish *Keene* are unavailing. Eastman's primary argument is that one of the facts relied on by the district court – that plaintiffs' labor had been performed by Eastman employees prior to the 2011 sale – still supports its conclusion that maintenance work is part of Eastman's "trade, business or occupation" under the statutory employee provision. The Court in *Keene*, Eastman urges, confirmed that each of the original three tests remains "a valid consideration." *Keene*, 870 S.E.2d at 163. And

___

[2] Unlike the Operating Agreement, which provided that DAK employees performing operations work would be "considered employees of Eastman [] for the purposes of worker's compensation laws," J.A. 457–58, the Services Agreement made no exception to the independent-contractor status of DAK's maintenance employees. Because the plaintiffs here, as maintenance workers, were covered exclusively by the Services Agreement, we need not evaluate the impact of the Operating Agreement's terms on the *Keene* analysis. But the *absence* of any such provision in the Services Agreement only highlights Eastman's unqualified decision to exit the business of maintenance and repair.

17

under the third test – whether "the identical activity . . . has been performed by employees of the owner," *Collins*, 772 S.E.2d at 514 – Eastman contends, the fact that Eastman's own employees had performed the same maintenance work as the plaintiffs until the 2011 sale means that the plaintiffs are statutory employees.

Whatever the precise status of this third test after *Keene*, it cannot do the work Eastman hopes – at least, not consistent with the actual holding of *Keene*. If Eastman is right, then the fact that Eastman used its own employees for maintenance work at the Calhoun County facility *before* it sold that facility in 2011 and *five years before* the 2016 accident is enough to establish that DAK's contractors remained statutory employees in 2016 and, presumably, remain so today. Once a company uses its own employees to perform a certain activity, that is, it freezes into place that original employee relationship, which may not be altered by a subsequent decision to "outsourc[e]" the work "for legitimate business reasons." *Cf. Keene*, 870 S.E.2d at 163.

But that outcome, as should be clear from what we have said already, would turn *Keene* on its head. The animating principal of *Keene* is that business managers are entitled, for legitimate business reasons, to "outsourc[e] work that formerly was handled as a part of the business," and that when they do, the contractors who perform that work will not become statutory employees by virtue of this new "business judgment." *See id.* at 163. Instead, Eastman's deliberate and final decision to remove itself from the maintenance business altogether establishes the opposite: that Eastman "legitimately defined the scope of [its] company's business to *not* include that particular work." *Id*.

18

That is not to say, of course, that whether an activity "has been performed by employees of the owner" – the third of the traditional tests – may never be a "valid consideration" after *Keene*. The *Keene* court itself pointed to one context in which it might be probative, in its approving description of *Bridges v. Wyandotte Worsted Co.*, 132 S.E.2d 18 (1963), as the first in the line of cases in which it began to "narrow[]" its "original view" of the statutory employee provision. *Keene*, 870 S.E.2d at 160. In that case, a company that ordinarily employed its own maintenance workers made a "temporary change," using independent contractors on one occasion "due to the excessive amount of overtime that its men had already worked." *Id.* (quoting *Bridges*, 243 S.E.2d at 20). "Honor[ing] the original business decision," the *Keene* court explained, those contractors were deemed statutory employees: that "the work was performed on one occasion by a contactor did not change the defendant's business decision to include maintenance and repair . . . as part of its business." *Id.*

There may well be cases, in other words, in which it is not clear whether an employer has "defined the scope" of its business, *id.* at 163, to include certain outsourced work, and whether the outsourced work is regularly performed by the business's own employees, as in *Bridges* – or, indeed, any of the three traditional tests – may shed important light on that inquiry. But this is not such a case. Eastman's choice to outsource its maintenance and repair operations over a decade ago, in conjunction with a sale of its facility, was complete, unequivocal, and final. There is no contention that this choice was anything but a "legitimate business decision." *Id.* *Keene* instructs us to "put value on the business decisions of management," *id.* at 162, and here it is plain that management has "defined

19

the scope of [Eastman's] business to not include" the maintenance work performed by DAK's contractors, *id.* at 163. It follows under *Keene* that the plaintiffs are not Eastman's statutory employees, and that their actions may proceed.

**2.**

Eastman has a final, alternative argument: Even if *Keene* makes clear that the plaintiffs are not its statutory employees, Eastman contends, we should affirm the district court's decision because that court correctly applied South Carolina's prior precedent and the *Keene* decision should apply only prospectively. We disagree. We need not resolve whether the premise of Eastman's argument – that but for *Keene*, the plaintiffs would qualify as statutory employees under South Carolina law – is correct. The South Carolina Supreme Court *has* decided *Keene*, and *Keene* applies to this case.

In assessing the retroactive effect of a state court decision while sitting in diversity, we apply governing state law, and again "anticipate," to the extent necessary, whether the state's highest court would choose to apply a decision retroactively. *See Stahle*, 817 F.3d at 100. Under South Carolina law, "judicial decisions in civil cases are presumptively retroactive." *Lord v. D & J Enterprises, Inc.*, 757 S.E.2d 695, 699 (2014) (internal quotation marks omitted). The South Carolina Supreme Court has recognized two narrow scenarios in which prospective-only application may be appropriate: decisions "creat[ing] a new cause of action," and – the exception relied on by Eastman here – those "in which immunities have been dissolved." *Toth v. Square D Co.*, 377 S.E.2d 584, 586 (1989). Both

20

sets of cases, the Court has reasoned, "create[] liability where none had previously existed," making it "unfair and inappropriate" to impose retroactive liability without due notice. *Id.*[3]

On the other hand, if a decision merely "restated the focus" of an inquiry, *Carolina Chloride, Inc. v. S.C. Dep't of Transp.*, 706 S.E.2d 501, 503 (2011), or "clarified the test in assessing the scope" of a right or duty, *Lord*, 757 S.E.2d at 700, it will be applied retroactively. *Keene*, which set out to "refocus" the statutory employment inquiry and "apply the doctrine in light of the General Assembly's original purpose for enacting it," *Keene*, 870 S.E.2d at 157, 163, falls squarely on this side of this line. For one, *Keene* neither created a right nor abolished an immunity, but rather interpreted the scope a decades-old immunity established by statute. Moreover, the Court in *Keene* clearly did not view *itself* as fundamentally altering the state's statutory employment jurisprudence. To the contrary, the *Keene* Court determined that "*none* of [its] recent jurisprudence . . . is consistent with the broad interpretation" of immunity posited by Eastman. 870 S.E.2d at 160 (emphasis added). Rather than diverging from – let alone abrogating – a well-settled immunity doctrine, *Keene* synthesized a line of cases that long preceded the accident at issue here. Indeed, *Keene*'s immediate predecessor, *Olmstead* – in which the Court purported to "overrule all prior cases to the extent they are in conflict with" its analysis –

---

[3] These cases generally involve situations where the Supreme Court expressly created a new common-law cause of action or abrogated a common-law immunity, *see Walton v. Stewart*, 289 S.E.2d 403 (1982) (abolishing parental immunity); *Ludwick v. This Minute of Carolina*, 337 S.E.2d 213 (1985) (creating tort of retaliatory discharge), or where the South Carolina legislature passed a statute creating a right or rescinding an immunity, *see Douglass v. Florence Gen. Hosp.*, 259 S.E.2d 117 (1979) (modifying charitable immunity).

21

was decided in 2003, almost a decade before Eastman's initial decision to outsource its labor to DAK. *Olmstead*, 581 S.E.2d at 486.

The South Carolina Supreme Court's denial of rehearing in *Keene* further supports this conclusion. The *Keene* defendant's petition for rehearing requested, in part, that the Court render its decision solely prospective in application, but the Court declined to grant rehearing on that basis. And the South Carolina Court of Appeals has deemed such a denial relevant to the retroactivity inquiry. *See Miranda C. v. Nissan Motor Co.*, 741 S.E.2d 34, 40 n.4 (Ct. App. 2013) ("Branham specifically argued in his petition for rehearing that the supreme court declare its decision only applied prospectively based on fairness and justice to the parties. Despite Branham's argument, the supreme court denied his petition for rehearing."). The Court's denial of rehearing, though not binding law, thus helps us "predict," to the extent it is not already clear under South Carolina law, "how the question would be decided" by that very Court. *Stahle*, 817 F.3d at 99.

Eastman is correct that *Keene* will alter the statutory employment analysis undertaken by lower courts and may affect the outcome in some cases. But the same can be said of virtually any state supreme court case that clarifies or untangles a messy area of the law, and it is not, without more, enough to rebut the presumption of retroactive application under South Carolina law. When a Supreme Court decision "restate[s] the focus" or "clarifie[s] the test" in assessing the scope of a right or duty, that decision is to be applied retroactively. *Carolina Chloride, Inc.*, 706 S.E.2d at 503; *Lord*, 757 S.E.2d at 700. *Keene* falls clearly within that category, and we therefore apply it to the case before us.

22

**B.**

Finally, we turn to the question of Eastman's co-defendant, Mundy, which employed the contractors who made the initial attempt to clear the drainpipe before the explosion. As noted above, the district court held that Mundy's statutory immunity followed as a direct consequence of Eastman's. That is because the Act bars suit by a statutory employee against both a business owner *and* "those conducting [the owner's] business," S.C. Code § 42-5-10, codifying the common-law "fellow-servant doctrine" under which employees may not sue co-employees for negligence, *see Powers v. Powers*, 123 S.E.2d 646, 647 (1962). At the time of the 2016 accident, Mundy's employees, like DAK's, "were performing preventative maintenance on one of the lines that produces chemicals for Eastman," J.A. 177, and under the district court's reasoning, that made *both* sets of contractors Eastman's statutory employees. Because the plaintiffs were thus statutory *co*-employees of Mundy's workers, the court held, the codified fellow servant doctrine barred their claims against Mundy as well as against Eastman.[4]

No party challenges this aspect of the district court's ruling. And the implications for this appeal are clear: If the plaintiffs are *not* Eastman's statutory employees, as the district court believed, then they also are not the statutory *co*-employees of Mundy's workers, and the fellow servant doctrine does not bar their tort actions against Mundy. Our

---

[4] The district court initially held that, although the fellow servant doctrine exempted Mundy's employees from suit, this immunity did not flow vicariously to Mundy itself. On reconsideration, the court concluded that Mundy was, in fact, vicariously immune, and the plaintiffs do not appeal that determination.

23

holding that the plaintiffs are independent contractors and not statutory employees under *Keene*, in other words, means that their suits may proceed against Mundy as well as against Eastman.

Mundy does not argue otherwise. Instead, it asks that we affirm the district court's judgment on an alternative ground: that South Carolina's common-law "borrowed servant doctrine" independently warrants dismissal. Under the borrowed servant doctrine, "if an employer lends his employee to a second employer, and if the employee is under the control of the second employer, the employee is considered employed by the second employer." *Eaddy v. A.J. Metler Hauling & Rigging Co.*, 325 S.E.2d 581, 582 (Ct. App. 1985). Mundy contends that when its employees attempted to heat the clogged drainpipe at the Calhoun County plant, they acted as Eastman's borrowed servants, so that any liability for their acts would flow to Eastman and not to Mundy. *See Cooke v. Palmetto Health All.*, 624 S.E.2d 439, 443 (Ct. App. 2005). The district court addressed this alternative ground for dismissal, but it concluded only that on the "current evidence of record," Mundy had not established that the borrowed servant doctrine justified dismissal. J.A. 282.

Whatever the merits of Mundy's borrowed servant argument, we decline to reach it at this stage in the proceedings. Mundy moved to dismiss the plaintiffs' actions only for lack of subject matter jurisdiction under Rule 12(b)(1). And the district court ordered limited discovery "only on issues related to the court's subject matter jurisdiction and the workers' compensation statutory employment doctrine." J.A. 5. On a Rule 12(b)(1) motion, a district court may properly consider such "evidence outside the pleadings without

24

converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

But no party contends that Mundy's borrowed servant argument, as a common-law defense to substantive tort liability, is in any manner jurisdictional. Indeed, this alternative defense presupposes that the court *does* have jurisdiction and posits that all resulting liability should flow to Eastman, not Mundy. It is not clear how this merits defense could be brought by way of a Rule 12(b)(1) motion; instead, it appears to be in essence an argument that the limited record here, developed solely to determine subject matter jurisdiction, also justifies a grant of summary judgment on the merits under Rule 56. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

The district court did not convert Mundy's Rule 12(b)(1) motion to one for summary judgment, nor did it apply Rule 56 in addressing Mundy's borrowed servant argument. Instead, the district court held only that it was "not persuaded" that the "current evidence of record" – which was, again, developed only to resolve the court's jurisdiction – required dismissal on this alternative ground. Mundy is free to again raise its borrowed servant defense, and all other merits defenses, on a complete record developed through the usual discovery process. Accordingly, even if we may properly reach this issue on appeal, "nothing requires us to do so, and we decline to engage in such lengthy alternative analyses here." *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 515 (4th Cir. 2015).

25

## III.

For the foregoing reasons, we reverse the district court's judgment dismissing the plaintiffs' actions for lack of jurisdiction and remand the case for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*